IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 4, 2024 Session

## STATE OF TENNESSEE v. TERRANCE WILLIAMS

**Appeal from the Criminal Court for Shelby County
Nos. C21-03737, 21-02261          Lee V. Coffee, Judge**

_____

### No. W2023-01447-CCA-R3-CD
_____


A Shelby County jury convicted the defendant, Terrance Williams, of conspiracy to commit first-degree murder, attempted first-degree murder, and employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of fifty-six years in confinement.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and KYLE A. HIXSON, JJ., joined.

Gerald S. Green (on appeal) and John Dolan (at trial), Memphis, Tennessee, for the appellant, Terrance Williams.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Kevin McAlpin and J.D. Hamblen, Assistant District Attorneys General, for the appellee, State of Tennessee.


## OPINION

### *Facts and Procedural History*

At approximately 11:00 a.m. on August 20, 2020, Tiffany Jones, a medical assistant at the Shelby County Jail, witnessed a verbal altercation between the defendant, who was

incarcerated at the time, and Derrius Davis, the victim and a correctional officer at the jail.[1] The altercation lasted three to five minutes and did not become physical at any point.

Stephanie Williams and Tyrone Williams, also indicted in this case, testified as State's witnesses at trial. Ms. Williams, the defendant's sister, testified that she received a phone call from the defendant at 12:10 p.m. on August 20, 2020. During the recorded phone call, the defendant told Ms. Williams that "he need[ed] this handled." Ms. Williams, who was aware of the ongoing dispute between the defendant and the victim, understood the defendant to mean that he wanted Ms. Williams' son, Tyrone Williams, "[t]o scare [the victim]. Put some fear in [the victim]." The defendant stated that Mr. Williams should "let the motherf****r know, you know what I'm saying." The defendant told Ms. Williams that "if [Mr. Williams] handle[d] this, it's his." Ms. Williams testified that "it's his" meant the defendant would give Mr. Williams the defendant's car.

At 1:39 p.m., an unknown inmate called Ms. Williams and asked if she had spoken to her son. Ms. Williams had thus far been unable to reach Mr. Williams and told the inmate that she had not spoken to him yet. The inmate told Ms. Williams to "tell [Mr. Williams] to go federal" and "give him the keys." Mr. Williams called Ms. Williams a short time later, and Ms. Williams told him that "his uncle called and he said to handle that for him." On cross-examination, Ms. Williams denied lying to police about the meaning of "go federal," testifying that she told officers that it meant to beat someone up. Ms. Williams admitted that she initially told detectives that the victim's house number, which she verified during her call with the defendant, was the price of a cake she was going to purchase for the defendant's son. She denied having an agreement with the defendant or Mr. Williams regarding the victim.

Tyrone Williams testified that Ms. Williams told him "[t]hat [the defendant] wanted [Mr. Williams] to take care of something for him." Although Ms. Williams did not specify what the defendant wanted, Mr. Williams "just knew what it was" because the defendant had repeatedly told his family about his dispute with the victim. As Mr. Williams drove to the victim's house, he saw the victim's car at a nearby Ace Hardware and waited for the victim to pull out of the parking lot. While the victim was stopped at the light at South Parkway and Bellevue, Mr. Williams pulled up next to the victim's driver's side, leaned over, and shot into the victim's car four times. Mr. Williams testified that he had never had an issue with the victim and did not know him personally.

On cross-examination, Mr. Williams agreed that he never spoke with the defendant about the victim and that all his discussions regarding the defendant and the victim were with Ms. Williams. However, Mr. Williams testified that the instructions on the day of the

---

[1] The victim died prior to trial from causes unrelated to the events of this case.

shooting were "from [the defendant] but no[t] direct." Mr. Williams testified that he intended to kill the victim and did not think about what he was doing before shooting into the victim's car. Although Mr. Williams testified that he did not have an agreement with the defendant, he "knew what [the defendant] wanted." On redirect examination, Mr. Williams testified that he anticipated receiving the defendant's car after killing the victim.

Detective Gregory Buchanan with the Shelby County Sheriff's Office ("SCSO") learned that the victim had driven to their building following a shooting incident. Detective Buchanan went outside and observed the victim, who appeared "distraught [and] shaken," standing next to his vehicle. The victim told Detective Buchanan that someone shot at him, and Detective Buchanan discovered four bullet holes in the driver's side of the victim's vehicle. When the victim went inside to give a statement, he began rubbing his leg, and Detective Buchanan noticed the victim's pant leg was torn. The victim, who denied being shot, took his keys out of his pocket, and "it appeared that a bullet . . . went through [the victim's] pant leg and impacted [his] keys."

Detective William Greever with the SCSO assisted in processing the scene of the shooting, photographing and collecting all evidence. In particular, Detective Greever collected four 9 mm shell casings. Later, Detective Greever participated in searches of the victim's and Mr. Williams' vehicles. Upon inspecting the victim's vehicle, Detective Greever located four projectile strikes on the driver's side, three in the driver's side door and one in the back door. Inside Mr. Williams' vehicle, Detective Greever recovered a 9mm pistol on the driver's side floorboard and a loaded magazine in the driver's side door compartment.

Detective Chase Craven with the SCSO canvassed businesses near the crime scene and obtained video surveillance footage from the time of the shooting. Upon reviewing the surveillance video, Detective Craven observed the victim's black Infiniti SUV pull up to the stop light. A few seconds later, a silver Nissan Murano pulled up on the victim's driver's side and fired several shots. As the stop light turned green, the victim drove north at a high rate of speed, and the silver Murano turned left onto South Parkway. During the course of the investigation, the defendant was developed as a suspect, and Detective Craven began reviewing the defendant's recorded jail calls. After reviewing the calls, Detective Craven located Mr. Williams driving a vehicle that matched the one in the surveillance video.

The defendant declined to present evidence. Following deliberations, the jury convicted the defendant of conspiracy to commit first-degree murder, attempted first-degree murder, and employing a firearm during the commission of a dangerous felony, and the trial court imposed an effective sentence of fifty-six years in confinement. The

defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

## *Analysis*

On appeal, the defendant argues the evidence presented at trial was insufficient to support his convictions. The State contends the evidence is sufficient. Upon our review, we agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or

- 4 -

both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). "Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). "No particular act need be shown. It is not necessary for one to take physical part in the crime[;] [m]ere encouragement of the principal is sufficient." *Id.* The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Moreover, under the doctrine of criminal responsibility, a person is liable not only for the target offense, but also for offenses committed by a confederate that were the natural and probable consequences of the target offense. *State v. Stokes*, No. E2023-00667-CCA-R3-CD, 2024 WL 2032847, at *5 (Tenn. Crim. App. May 7, 2024), *perm. app. denied* (Aug. 13, 2024) (citing *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000)). Whether an offense was a natural and probable consequence of the target offense is a question for the jury as the finder of fact. *Id.* The principle behind the rule is "based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably[,] and foreseeably put into motion." *Id.* To demonstrate liability, the State must prove the following beyond a reasonable doubt: "(1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." *Id.*

## A.     Attempted First-Degree Murder[2]

The defendant was convicted of one count of attempted first-degree murder. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of

---

[2] For the sake of clarity, we have reordered the issues from the order they appear in the defendant's brief.

reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion that the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

In the light most favorable to the State, the evidence established that the defendant intended for Mr. Williams to kill the victim when the defendant told Ms. Williams that he wanted the victim "handled." Following a verbal altercation with the victim, the defendant contacted Ms. Williams and instructed her to have Mr. Williams "handle" the victim. The defendant promised Mr. Williams a car in exchange for "tak[ing] care" of the victim. Although Mr. Williams was not given specific instructions, he "knew" the defendant

wanted him to kill the victim. As the victim was at a stop light, Mr. Williams pulled up next to him and fired four bullets into the driver's side of the victim's vehicle, striking a set of keys in the victim's pocket. Mr. Williams testified that he intended to kill the victim when he shot into the victim's vehicle. This is sufficient evidence upon which a rational jury could find the defendant criminally responsible for the attempted first-degree murder of the victim. The defendant is not entitled to relief on this issue.

## B.    Conspiracy to Commit First-Degree Murder

The defendant was convicted of one count of conspiracy to commit first-degree murder. Conspiracy is committed when "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." Tenn. Code Ann. § 39-12-103(a). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." *Id.* at § 39-12-103(d).

> Conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

*Id.* at § 39-12-103(e)(1). The underlying offense of the conspiracy in the present case was first-degree murder, which is "[a] premeditated and intentional killing of another." *Id.* at § 39-13-202(a)(1). Even though the defendant and his accomplices did not complete the first-degree murder of the victim, it is not a defense "that the offense that was the object of the conspiracy was not committed." *Id.* at § 39-12-103(f).

"While the essence of the offense is an agreement to accomplish a criminal or unlawful act, . . . the agreement need not be formal or expressed, and it may be proven by circumstantial evidence." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998) (internal citation omitted). "[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The defendant contends the State failed to provide sufficient evidence to corroborate the testimonies of Ms. Williams and Mr. Williams as accomplices. At the time of the

offense, it was well-established that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (internal quotation marks omitted)) (abolishing the common law accomplice-corroboration rule on a prospective basis). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). It is not in dispute that Ms. Williams and Mr. Williams qualified as accomplices.

Our supreme court recently described the accomplice-corroboration rule as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Thomas*, 687 S.W.3d at 240 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is for the jury to determine. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).

In the light most favorable to the State, the evidence establishes that the defendant and the victim were engaged in an ongoing dispute, which culminated in a verbal altercation on the morning of August 20, 2020. An hour after the altercation, the defendant called Ms. Williams from jail and stated that he "need[ed] this handled" and that Mr. Williams should "go federal" on the victim and "let [the victim] know, you know what I'm saying." He told Ms. Williams that Mr. Williams could have the defendant's car after he handled the victim. Although the defendant spoke in code during the phone call with Ms.

Williams, she understood the defendant's instructions and verified the victim's address during the conversation. She told Mr. Williams that the defendant "wanted [him] to take care of something for [the defendant]." Mr. Williams testified that, because he was aware of the defendant's ongoing dispute with the victim, he "just knew" what the defendant wanted. Mr. Williams testified that he intended to kill the victim when he fired four bullets into the victim's car and that his instructions were "from [the defendant] but no[t] direct." The victim was not injured during the shooting, but one of the bullets hit a set of keys in the victim's pants.

Moreover, Ms. Williams' and Mr. Williams' testimonies were sufficiently corroborated by Ms. Jones' description of the altercation between the defendant and the victim hours before the shooting as well as the recorded jail calls in which the defendant instructed Ms. Williams to have Mr. Williams "handle" the victim and verified the victim's address. This evidence fairly and legitimately tended to connect the defendant with the commission of the crime sufficient to corroborate the testimonies of Ms. Williams and Mr. Williams. Therefore, we conclude that the evidence is sufficient to sustain the defendant's conspiracy to commit first-degree murder conviction, and the defendant is not entitled to relief on this issue.

## C.      Employing a Firearm During the Commission of a Dangerous Felony

The jury convicted the defendant of employing a firearm during the commission of a dangerous felony under a theory of criminal responsibility. As relevant to this case, "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1). One such "dangerous felony" is attempted first-degree murder. *Id.* at § 39-17-1324(b)(2), (i)(1)(A). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). The evidence at trial showed that, after receiving instructions from the defendant to "handle" the victim, Mr. Williams pulled up next to the victim as he was at a stop light and fired four bullets into the side of the victim's vehicle. Therefore, the evidence is sufficient to support the defendant's employing a firearm during the commission of a dangerous felony conviction under a theory of criminal responsibility. The defendant is not entitled to relief on this issue.

Alternatively, we conclude that the defendant's crimes were a natural and probable consequence of the orders he gave Mr. Williams, and the crimes committed by Mr. Williams. As noted *supra*, the natural and probable consequences rule "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard,* 30 S.W.3d 271, 276 (Tenn. 2000) (citing *State v. Carson,* 950 S.W.2d 951, 954-55 (Tenn. 1997)) . Although the natural and probable consequences rule is not explicitly included in the code, it nevertheless "survived

the common law into the criminal responsibility statutes[.]" *Id.* (citing *Carson,* 950 S.W.2d at 954-55). This rule "underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." *Id.* (citing *Carson,* 950 S.W.2d at 954-55; *Key v. State,* 563 S.W.2d 184, 186 (Tenn. 1978); *State v. Grooms,* 653 S.W.2d 271, 275 (Tenn. Crim. App. 1983)). The Tennessee Supreme Court established a three-part test that must be satisfied before imposing liability under the natural and probable consequences rule:

> [T]o impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

*Id.* The natural and probable consequences rule "reinforces the principle that the jury, not the court, is vested with the power to weigh the sufficiency of evidence and determine whether collateral crimes, committed by relevant parties in both physical and spatial proximity of the target crime, are the natural and probable consequences of the intended criminal behavior." *State v. Richmond,* 90 S.W.3d 648, 656-57 (Tenn. 2002). "[T]he natural and probable consequence rule 'presupposes an outcome within a reasonably predictable range.'" *Id*. at 276 (quoting *Carson,* 950 S.W.2d at 955).

Here, the trial court properly instructed the jury on the natural and probable consequences rule. *See* T.P.I.—Crim. 3.01 Criminal responsibility for conduct of another (2021). Relying on our prior analysis, we conclude that the State established the aforementioned factors beyond a reasonable doubt. We also conclude that a reasonable jury could have found that based on the orders given by the defendant to Ms. and Mr. Williams—he needed "this handled"; "let the motherf****r know, you know what I'm saying"; and "to go federal"—that Mr. Williams arming himself with a gun and that the conspiracy to commit first-degree murder, the attempted first-degree murder, and employment of a firearm during the commission of a dangerous felony were the natural and probable consequences of those orders. Therefore, the evidence is sufficient to sustain the defendant's convictions.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____

J. ROSS DYER, JUDGE